APL, INC.; Atec Industries, Inc.; and Atec Aluminum Extrusions, Inc., Appellants,

v.

OHIO VALLEY ALUMINUM, INC., Appellee.

No. 91–CA–002532–MR.

Court of Appeals of Kentucky.

Oct. 23, 1992.

W. Craig Aulenbach, Aulenbach & Shapero, Louisville, Sidney N. Freeman, Robert McNamara, McNamara & Freeman, Uniontown, Ohio, for appellants.

C. Lewis Mathis, Jr., Mark D. Dean, Mathis, Riggs, Prather & Dean, P.S.C., Shelbyville, Larry L. Adair, Sunrise, Fla., for appellee.

Before HAYES, HUDDLESTON and SCHRODER, JJ.

HUDDLESTON, Judge.

APL, Inc., and its subsidiaries, appeal from a summary judgment finding APL liable on a guaranty of payment extended to Ohio Valley Aluminum, Inc. Because we agree that Ohio Valley was entitled to judgment as a matter of law, we affirm.

APL Corporation is a holding company that owns APL Shelter Products Corporation. APL Shelter Products owns ATEC Industries, Inc. (ATEC), which in turn owns ATEC South, Inc. (ASI). APL may therefore be considered the parent company of the other corporate defendants in this case.

Ohio Valley Aluminum, Inc. (OVACO), is a manufacturer of aluminum extrusion billet, the material used in the production of aluminum commercial products. OVACO did business with ATEC and ASI from June 1985 through March 1990, during which time it sold the two companies some 18,467,029 pounds of billet for the total sum of $7,670,837.03. At issue in this case is the last $139,237.91 worth of goods purchased on this account.

In 1987, ATEC/ASI's[1] account with OVACO came to be constantly sixty to ninety days in arrears. OVACO notified ATEC that it would discontinue its extension of credit to ATEC unless the company obtained some sufficient security for payment of the account. In response, one of APL's holdings provided OVACO with a standby letter of credit, which expired in September 1989. ATEC/ASI's account continued to be in arrears even after the standby letter was secured.

In the summer of 1989, as the standby letter's expiration date drew near, OVACO continued to be concerned about ATEC/ASI's ability to timely pay its account. OVACO in fact terminated shipments on the account until some additional security could be obtained, so there would be no outstanding balance on the account at the standby letter's expiration.

ATEC proposed that APL guaranty its account with OVACO so that OVACO would continue to extend credit. In September 1989, APL drafted a Guaranty of Payment which ATEC forwarded to OVACO. ATEC/ASI placed its next order with OVACO in February 1990.

The last shipment from OVACO to ATEC/ASI was made on March 13, 1990. No payment was made on the $139,237.91 due on this shipment. On May 14, 1990, OVACO demanded payment from APL pursuant to the guaranty. When payment was not forthcoming, OVACO filed the present action in June 1990.

APL answered in July, asserting *inter alia* that the goods represented by the account were nonconforming, that the documents attached to the complaint failed to make out a case in account, and that OVACO was estopped from asserting recovery by its own actions or failures to act.

In December 1990, OVACO filed its first amended complaint. APL and ATEC answered in January 1991, offering essentially the defenses outlined above, but includ-

---

**1.** See the discussion below regarding the APL–ATEC–ASI interlocking management structure.

ing an allegation that OVACO was not in compliance with the terms of the guaranty.

Pursuant to an agreed order of June 1991, OVACO and APL filed competing motions for summary judgment. In August 1991, Shelby Circuit Court entered judgment in favor of OVACO and against all corporate defendants on the respective summary judgment motions, in the amount of $139,237.91, plus interest. This judgment was supplemented by a September 1991 order granting OVACO attorneys' fees.

The trial judge found that the guaranty in question was an absolute guaranty, requiring no notification of acceptance. The judge found that the instrument was not required to conform to KRS 371.065, since that statute at the time of the guaranty's execution had application solely to guaranties of commercial paper. He finally found that defendants ATEC and ASI were essentially one entity. This appeal followed.

■ A guaranty is generally classified as either absolute or conditional.[2] An absolute guaranty is a contract by which the guarantor promises that if the debtor does not perform his obligation or obligations, the guarantor will perform some act (such as the payment of money) to or for the benefit of the creditor, irrespective of any additional contingencies. *Pulaski Stave Co. v. Miller's Creek Lumber Co.*, 138 Ky. 372, 128 S.W. 96, 102 (1910); see 38 Am. Jur.2d *Guaranty* § 21 (1968).

■ A conditional guaranty, on the other hand, contemplates as a condition to the guarantor's liability the happening of some contingent event other than the default of the principal debtor, or the performance of some act on the part of the creditor. The promise issued by the potential guarantor at the inception of a conditional guaranty is therefore generally construed to be only an offer to guarantee, acceptance of which must be communicated by the potential creditor to the offeror to be effective. *McGowan v. Wells' Trustee*, 184 Ky. 772,

213 S.W. 573, 577 (1919); 38 Am.Jur.2d at § 21.

■ When the circumstances surrounding the issuance of an absolute guaranty and the terms of the writing itself evidence no indication that the guarantor anticipated notification of acceptance from the creditor, the guarantor will be liable on the instrument from the time the creditor acts in reliance on it. *Pittsburgh Plate Glass Co. v. Cassidy*, 194 Ky. 81, 238 S.W. 172, 173–174 (1922); *McGowan v. Wells' Trustee*, 184 Ky. 772, 213 S.W. 573, 577–578 (1919); *J.R. Watkins Medical Co. v. Brand*, 143 Ky. 468, 136 S.W. 867, 868 (1911); *White Sewing Machine Co. v. Powell*, Ky., 74 S.W. 746 (1903); *Hall's Executor v. Farmers' Bank of Kentucky*, Ky., 65 S.W. 365, 366–367 (1901); *Thompson v. Glover*, 78 Ky. 193, 195 (1879).

■ The guaranty APL provided to OVACO stated the following:

### GUARANTY OF PAYMENT

TO: OHIO VALLEY ALUMINUM

FOR AND IN CONSIDERATION of financial accommodations and the extension of credit by Ohio Valley Aluminum (Valley) to Atec Industries, Inc., its affiliates and subsidiaries (Atec), which financial accommodations and extensions of credit have been and are of benefit to the undersigned corporation, which corporation is affiliated with Atec, the undersigned unconditionally guarantees prompt payment of all of Atec's obligation to Ohio Valley Aluminum, of whatsoever kind and nature, now existing or hereafter incurred or created.

The undersigned agrees that Valley need not institute any action or proceeding at law or in equity against Atec or anyone else or exhaust any remedies against Atec or anyone else or any security for any debt, as a condition precedent to bringing an action against the undersigned upon this Guaranty. The undersigned consents to the jurisdiction of and service of process by the State of

---

**2.** The terms "absolute guaranty" and "unconditional guaranty" are often used interchangeably.

See citations accompanying 38 Am.Jur.2d *Guaranty* § 21 (1968).

Kentucky; and in the event action is brought to enforce this Guaranty, the undersigned agrees that venue of any such action may be laid in Shelby County, Kentucky. In any action concerning this Guaranty, the undersigned agrees to pay to the holder of any indebtedness guaranteed hereby such sum as the court may adjudge reasonable as attorney's fees. This guaranty will expire on December 31, 1991.

The individual signing this Guaranty represents and warrants that he holds the office designated and is authorized to sign this Guaranty on behalf of APL Corporation.

DATED: September 6, 1989

APL CORPORATION

We discern nothing in this document indicating that it is anything but an absolute guaranty, payable on the default of the debtor regardless of any other contingency. We note no language in the document evidencing a desire on APL's part to receive a notification of acceptance from OVACO. The document by its terms purports to be nothing but a guaranty of debt, absolute and unconditional.

Similarly, the circumstances surrounding the issuance of the guaranty in no way evidenced that APL intended or expected to receive a notice of acceptance from OVACO. APL (through its subsidiaries)[3] and OVACO had carried on a continuing business relationship for some four years prior to the issuance of the guaranty. During that time OVACO had supplied APL with over $7,000,000.00 worth of aluminum extrusion billet. As noted above, the guaranty of payment APL issued to OVACO was intended to replace an expiring standby letter of credit. With the guaranty in place, all attendant circumstances indicate that both parties intended the business relationship to continue as usual. There is no indication that any sort of re-negotiation of the account was in order, requiring that OVACO somehow change its relationship with APL before the guaranty would be-

come effective. Indeed, in a letter accompanying the guaranty APL's Vice President and Controller, Stephen A. Hurwitz, stated:

> Please find enclosed our letter of guaranty with respect to your company. We look forward to a continuing relationship between Ohio Valley and Atec and would like you to give consideration to an increase in our line of credit.

As evidenced by this letter, not only did APL expect the relationship to continue apace, but it actually hoped to increase its credit with OVACO.[4]

We further note that it was five months after the issuance of the guaranty that ATEC/ASI placed its next order with OVACO. We believe this provided ample time for APL to make some representation to OVACO in some way indicating that APL required a formal acceptance of the guaranty, if this had in fact been the case. Again, we see nothing in the record indicating that such was the case.

■ Prior to its 1990 amendment, KRS 371.065 provided:

> No guaranty which is not written on the instrument involved shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates, provided that such termination shall not affect the liability of the guarantor with respect to:
>
> (1) Obligations created or incurred prior to such date, or
>
> (2) Extensions or renewals of, interest accruing on, or fees, costs or expenses incurred with respect to, such obligations on or after such date.

APL contends that KRS 371.065 has applied to all guaranties from the time of its enactment. It therefore submits that APL was entitled to summary judgment in the proceedings below, because the guaranty in

---

**3.** See discussion below.

**4.** We also note that nothing in the record suggests, and indeed APL does not contend, that the

guaranty was to be effective *on the condition* that OVACO increase APL's credit.

question did not contain a stated maximum amount as required by the statute, thus rendering it unenforceable.

The trial court ruled that KRS 371.065 only applies to guaranties of commercial paper, due to the fact that the House Bill introducing the statute (HB 286) was titled "AN ACT relating to commercial paper." The trial court therefore necessarily ruled that the reference to "instrument" in KRS 371.065 refers to only commercial paper.

HB 286 was originally intended to be codified in the Kentucky Revised Statutes' chapter relating to commercial paper as an amendment to KRS 355.3–416, the "Contract of guarantor" statute. When the bill reached the Senate, the statute was transferred to KRS Chapter 371, the chapter relating to the law of contracts. The bill's title, however—"AN ACT relating to commercial paper"—was not changed, and remained the operative title when the bill became law in 1986.

Kentucky Constitution § 51 requires that:

> No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be re-enacted and published at length.

This constitutional mandate considered, we hold that Kentucky's legislature did not intend to render KRS 371.065 unconstitutional by placing it in the KRS contract law chapter. And we hold that the statute retained its exclusive applicability to guaranties of commercial paper irrespective of its particular situs in Kentucky's Revised Statutes.

■ APL makes much of the fact that when KRS 371.065 was amended in 1990, the title of the act was changed to "AN ACT relating to guaranties." APL contends that the legislature thus explicitly revealed in 1990 that it had intended all along for the statute to apply to all guaranties.

APL's guaranty to OVACO was signed in 1989. We have held that in 1989 KRS 371.065 had applicability solely to guaranties relating to commercial paper, pursuant to the statute's 1986 enactment. APL's guaranty to OVACO did not guaranty a transaction involving commercial paper. The fact that KRS 371.065 was amended in 1990 to be given broader applicability is irrelevant for purposes of the present appeal.

We further note that the United States Constitution provides at Article I, Section 10:

> No State shall ... pass any ... *Law impairing the Obligation of Contracts....* (Emphasis supplied.)

Were we to embrace APL's position and hold that KRS 371.065's 1990 amendment operated to annul the 1989 guaranty contract between APL and OVACO, we would place our state legislature in direct violation of the federal constitution. This would require that KRS 371.065 itself be annulled. APL's position is accordingly without merit.

The trial court ruled that:

> The parties have agreed that the amount in question is $139,237.91, and for the purpose of disposing of this action, the Court finds that Apec [sic] Industries, Inc. and Apec [sic] South, Inc. is one and the same.

APL contends that the trial court erred by not distinguishing between ATEC and ASI. APL's guaranty, however, by its terms provided:

> FOR AND IN CONSIDERATION of financial accommodations and the extension of credit by Ohio Valley Aluminum (Valley) to Atec Industries, Inc., its affiliates and subsidiaries (Atec), which financial accommodations and extensions of credit have been and are of benefit to the undersigned corporation, which corporation is affiliated with Atec, the undersigned unconditionally guarantees prompt payment of all of Atec's obligation to Ohio Valley Aluminum, of whatsoever kind and nature, now existing or hereafter incurred or created.

We note, again, that APL is the holding company that owns APL Shelter Products, Inc. APL Shelter Products in turn owns ATEC Industries, Inc., which in turn owns ASI. The ATEC/ASI purchase orders with OVACO were made on forms headed "APL/ATEC."

We note again the language in the APL letter to OVACO accompanying the guaranty:

Please find enclosed our letter of guaranty with respect to your company. *We* look forward to a continuing relationship between Ohio Valley and Atec and would like you to give consideration to an increase in *our* line of credit.

Clearly, APL considered any credit extended to its subsidiaries to be the equivalent of credit extended to APL itself, as parent company.

Stephen Hurwitz, the individual who prepared and signed the guaranty in question, is Vice President and Controller of APL, Vice President of ATEC, and Vice President of ASI. Hurwitz was charged with managerial responsibilities in relation to all the named corporations. Jack Colonna, who reported directly to Hurwitz and requested that Hurwitz obtain the guaranty, is Executive Vice President and Chief Operating Officer of both ATEC and ASI. Colonna approved payment of the OVACO delinquent account in question. We note that ATEC and ASI have presently terminated their business operations, while APL remains operative.

The foregoing considered, we see no reversible error in the trial judge's ruling. APL is responsible for the debts of both ATEC and ASI, and that debt totals $139,-237.91.

Having considered the record as a whole, we agree with the trial court that no issue of material fact exists, and consequently that OVACO was entitled to judgment as a matter of law.

The judgment is affirmed.

All concur.