Tracy Glass LAMB; Sharon Johnson; and the Estate of Lilian Montgomery Appellants

v.

Lucy HOLMES, as Next Friend of A.L., A Minor; and Renita Weaterington, as Next Friend of T.W., A Minor Appellees

No. 2003–SC–000495–DG.

Supreme Court of Kentucky.

May 19, 2005.

Robert L. Chenoweth, Frankfort, Counsel for Appellant.

David R. Marshall, Lexington, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Appellees in this case brought five separate counts against the Appellant teachers and administrators of a Kentucky high school. Among these were a claim under 42 U.S.C.A. § 1983 for violation of their right to be free from unreasonable searches under the Fourth Amendment of the United States Constitution, a claim under § 2 of the Kentucky Constitution for deprivation of due process and three tort claims for intentional infliction of emotional distress, invasion of privacy and negligence. The claims were based on the following facts:

On November 17, 1998, during a physical education class at Lexington's Tates Creek Middle School, a student reported missing a pair of shorts. The classroom teachers, Terri Least and Sharon Johnson, told the students they would be given five minutes to return the missing shorts. When the shorts were not returned, Least went to the principal's office and returned with Tracy Lamb, an administrative intern, who gave the students an additional five minutes to return the shorts. After five minutes passed, Lamb left the class and returned with a security guard and Lillian Montgomery, an assistant principal at the school. They informed the students

that they would be searched in an effort to find the shorts. The students were then taken in pairs to a locker room and searched.

The Appellee's children, A.L., S.W. and T.W., all females, were taken to the girls' locker room, where A.L. and T.W. were searched. S.W. refused to be searched. There is a factual dispute as to how the search was conducted. A.L. and T.W. allege the girls were required to pull their shorts down beneath their knees and to raise their shirts above their breasts, exposing their underwear to those around them. The teachers/administrators argue they only required each student to turn her waistband down so they could tell if the students were wearing the missing shorts.

At all relevant times, the school board ("Board") had in effect a policy regarding student searches, which provided: "[i]n no instance shall [a] school official strip search any student." "Strip search" was not defined anywhere within the Board's policies.

Appellees filed a complaint against the Board, teachers, assistant principal and administrative intern alleging their wrongful acts caused the students to suffer extreme indignities and humiliation as they had been "held up to ridicule before their peers."

Following discovery, the school board moved for summary judgment on behalf of all Defendants. In response, Appellees conceded that the Board was immune from suit. They also conceded that the teachers and administrators were immune from suit in their official capacities. However, Appellees contended that the teachers were not entitled to qualified official immunity for the searches in their individual capacities.

In its order granting summary judgment and dismissing the complaint, the trial court concluded the students' rights had not been violated. In a subsequent order, the trial court clarified its ruling and stated that it was dismissing all of the claims brought by Appellees against all Appellants in their individual capacities.

Lucy Holmes, as next friend of her daughter, A.L., and Renita Weatherington, as next friend of her minor daughters, S.W. and T.W., appealed from the summary dismissal of their complaint. The Court of Appeals concluded the trial court erred in summarily dismissing the § 1983 claim as well as the state claims for violation of the right of privacy and negligence. The Court of Appeals found no error in the dismissal of Appellees' claims for the tort of outrage or intentional infliction of emotional distress. The Court also affirmed the summary judgment of the trial court as it pertained to the dismissal of claims against Terri Least, whom they agreed did not participate in the searches of the students, and former plaintiff S.W., who had refused to be searched. The Court of Appeals found Appellees' claim for violation of their substantive due process rights had not been raised in the proceedings, and therefore, would not be considered on appeal. In all other respects, the Court of Appeals vacated and remanded the judgment for further proceedings consistent with its opinion. We granted discretionary review and now reverse the Court of Appeals.

## II.  Issues

The questions of law before this Court, as stated in the Motion for Discretionary Review, are whether the Court of Appeals (1) correctly found the actions of the teachers/administrators violated the Fourth Amendment; (2) correctly denied qualified immunity to the teachers/administrators;

and/or (3) erroneously determined the actions of the teachers/administrators were in the performance of a ministerial duty or to have been clearly violative of a Board policy.

## A. *Fourth Amendment Rights Violation*

The Fourth Amendment to the United States Constitution guarantees all U.S. citizens the right to be free from unreasonable searches. Appellees herein contend their Fourth Amendment rights were violated when they were searched by the Appellant teachers/administrators.

In analyzing the constitutionality of a search conducted within the school setting, we turn to the guidance provided in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), wherein the U.S. Supreme Court determined first that the Fourth Amendment's protection against unreasonable searches applies to searches performed by public school officials as opposed to exclusively law enforcement officers. Second, the Court outlined that because of the "special needs" of the school environment a standard lesser than probable cause should be utilized to assess the legality of school searches. *See Id.* at 333, 105 S.Ct. at 738. The Court promulgated a simple "reasonableness standard" in reviewing the circumstances of a school search and quoted from *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), which requires a two-fold inquiry for interpreting the reasonableness of any search: (1) whether the search was "justified at its inception", and (2) whether the search was "reasonably related in scope to the circumstances which justified the [search]."

■ The Court in *T.L.O.* outlined that a search by a teacher/administrator of a student would be " 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school" and would be "permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." 469 U.S. at 342, 105 S.Ct. at 743.

Recently, the 6th Circuit Court of Appeals confronted a case factually similar to the case before us. In *Beard v. Whitmore Lake School District*, 402 F.3d 598 (6th Cir., 2005), the court addressed a § 1983 claim against a police officer and teachers involved in strip searching high school students after another student in the high school gym class reported a theft of money. Approximately 20 boys were taken to the boys' locker room and individually asked to remove their shirts and lower their pants and underwear, while 5 female students were taken to the girls' locker room and made to pull up their shirts and pull down their pants while standing in a circle. Neither the boys nor girls were touched during the searches and the girls were not made to remove their underwear. The stolen money was never discovered as was the case here.

The searches in *Beard* were found to be unconstitutional. The Court of Appeals also found, however, that at the time the searches were performed the law regarding the reasonableness of a strip search under these circumstances was not "clearly established." Therefore, the court reversed the trial court's denial of the Defendant's motion for summary judgment regarding the § 1983 claim.

■ In determining the searches conducted on the students were unconstitutional in scope, the court was guided by the analysis found in *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386,

132 L.Ed.2d 564 (1995), which sets forth the relevant criteria for evaluating searches performed in the absence of individualized suspicion. In *Vernonia*, the Supreme Court considered three factors to determine if the school searches were reasonable, (1) the student's legitimate expectation of privacy, (2) the intrusiveness of the search, and (3) the severity of the school system's needs that were met by the search. *Id.* at 664–65, 115 S.Ct. 2386.

The 6th Circuit in *Beard* found the students' privacy interests were great, quoting from *T.L.O.*, wherein the Supreme Court noted that the "search of a child's person...is undoubtedly a severe violation of subjective expectations of privacy." *See T.L.O.*, 469 U.S. at 337–38, 105 S.Ct. at 740–741. The 6th Circuit Court of Appeals, however, found that one's presence in a locker room lowered one's privacy expectations so that a child searched within a locker room would not be as deprived of a privacy interest as a child searched within an office, for example. *See Beard v. Whitmore Lake School District*, 402 F.3d 598, 605 (6th Cir.2005).

The Court of Appeals in *Beard* found the scope of the search to be determinative as to its constitutionality, as the scope exceeded what a student would normally expect, even in a locker room situation. The court pointed out these students did not voluntarily subject themselves to a degree of regulation as in the *Vernonia* case where the students were high school athletes being randomly drug tested. The court also noted the character of the intrusion on the student's privacy interests was greater and would reveal more than the limited information at issue in the *Vernonia* drug testing.

The 6th Circuit Court of Appeals also found the governmental interest in this fact scenario was not as great as in cases like *Vernonia* dealing with drug issues,

even though it could be said there is a valid interest in "maintaining an atmosphere free from theft." *Id.* The court elaborated on governmental interests saying a search to find items that pose a threat to the health or safety of students would serve a weightier governmental interest than one merely to find money or stolen property, and a search conducted without "individualized suspicion" also decreases the governmental interest in conducting a search.

The *Beard* court ruled the male searches were unconstitutional, saying:

> [I]n light of the highly intrusive nature of the [male] searches, the fact the searches were undertaken to find missing money, the fact the searches were performed on a substantial number of students, the fact that the searches were performed in the absence of individualized suspicion, and the lack of consent, taken together, demonstrate that the searches were not reasonable, ...[and thereby] under *T.L.O.* and *Vernonia*, the searches violated the Fourth Amendment.

*Id.*

The Court of Appeals then separately analyzed the female searches, concluding they were also unconstitutional for much of the same reasoning. The only difference being the 5 females were not required to remove their underwear, but did undress in front of each other. The court cited *Reynolds v. City of Anchorage*, 379 F.3d 358, 365 (6th Cir.2004), wherein the 6th Circuit Court of Appeals analyzed the reasonableness of a strip search occurring in a juvenile group home and found it important that the search was "conducted in a way designed to minimize its intrusive effect" and that the search took place "in the presence of only a single staff member."

In the case at hand, we deal with three girls, one who refused to be searched, and two others who were searched in the girls' locker room by female teachers. The searches were actually conducted on three classrooms of students, but we only address today two of the girls' complaints. There is a factual dispute as to what was required of the girls during these searches. The students contend they were required to raise their shirts and lower their shorts, revealing their underwear. The teachers claim the girls were only required to turn their waistbands down, not revealing their underwear.

If the facts are as the students allege, we have almost the exact situation as that analyzed in *Beard* by the 6th Circuit Court of Appeals. If the facts are as the teachers allege, the searches would appear to be less intrusive than those discussed in *Beard,* as the girls' underwear was not revealed, and the searches could hardly be described as "strip searches".

The searches the students described, which involved removing their clothing to the extent of exposing their underwear to the teachers, would now be considered unconstitutional because (1) the searches were intrusive in nature, (2) the searches were conducted to find a missing pair of shorts, (3) a large number of students were subject to the searches, (4) the searches lacked individualized suspicion, (5) the students did not consent to the searches, and (6) the searches were conducted in front of other students. This analysis mirrors that articulated by the 6th Circuit Court of Appeals in *Beard.*

If the searches were conducted as the teachers/administrators describe, the searches were not unconstitutional (or didn't violate the Fourth Amendment) in that the scope of such a search would not exceed what a student would expect in a locker room setting and could not be deemed as intrusive as a search requiring exposure of one's underwear to others, be they students and/or teachers/administrators.

However, we have concluded we need not remand this case for a factual determination of which search described by the parties actually occurred, because we hold today that the law, at the time these searches were conducted, did not clearly establish searches conducted in either described manner would be unreasonable, and therefore the teachers/administrators are entitled to qualified immunity.

### B. *Qualified Official Immunity*

■ Officials who are sued for monetary relief under § 1983 may assert either an absolute immunity or qualified immunity defense. The Supreme Court has generally limited absolute immunity to officials who perform judicial, prosecutorial and legislative functions, but has allowed qualified immunity to be asserted by school officials. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

■ Qualified immunity protects state and local officials who carry out executive and administrative functions from personal liability so long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

The *Harlow* objective reasonableness standard "is intended to provide government officials with the ability to 'reasonably anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton,* 483 U.S. 635, 647, 107 S.Ct. 3034, 3043, 97 L.Ed.2d 523 (1987)(*quoting Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)). In *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666

(2002), the Supreme Court held the objective reasonableness standard requires a determination as to whether the defendant official had "fair warning" that his/her conduct violated federal law.

The 6th Circuit Court of Appeals in *Beard* found *T.L.O.* and *Vernonia*, while instructive in the area of analyzing school searches, "do not offer the guidance necessary to conclude that the officials were, or should have been, on notice that the searches performed in this case were unreasonable." *Beard v. Whitmore Lake School District*, 402 F.3d 598, 607(6th Cir.2005)(internal citations omitted). The court found "[t]he 6th Circuit cases involving strip searches also do not clearly establish the unconstitutionality of the searches in the instant case." *Id.* at 607.

The only precedent the Court of Appeals found regarding the constitutionality of strip searches came from the Seventh Circuit, which had held a strip search of a student in particular circumstances was not reasonable. The court, however, cited the applicable rule to follow regarding precedent, discussed in *Williams v. Ellington*, 936 F.2d 881, 885(6th Cir.1991)(*quoting* from *Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d at 1171, 1177(6th Cir.1988)), which says:

> In the "rare instance" where it is proper to seek guidance from outside this circuit, the law will only be *clearly established* where the cases outside the circuit "both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting."

■ We agree with the 6th Circuit Court of Appeals that the current law, much less the law in effect when these searches occurred in 1998, did not give "fair warning" to the school teachers/administrators that their actions would be in clear violation of a federal statutory or constitutional right. The 6th Circuit Court of Appeals in *Beard* examined the available federal precedent and the only state decision available on the issue of strip searching students is *Rone v. Daviess County Bd. of Educ.*, 655 S.W.2d 28 (Ky. App.1983), which held there were reasonable grounds for strip searching a student to determine whether he was carrying drugs and that student was never offensively touched. This available case law could hardly be described as "clearly establishing" the students' rights as to warn the teachers/administrators herein their actions would be in violation of the Fourth Amendment of the United States Constitution.

## C. *Ministerial Duties and the Board Policy against Strip Searches*

The third issue raised by Appellants in their Motion for Discretionary Review was whether the Court of Appeals erroneously determined the actions of the teachers/administrators were in the performance of a ministerial duty or to have been clearly violative of a Board policy.

This issue is critical because the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738 (1982), limited the application of a qualified immunity defense to "officials performing discretionary functions." *Harlow* left unresolved the immunity applicable to officials who perform ministerial acts and the lower federal courts are in conflict on this issue.

■ The *Harlow* qualified immunity defense, however, does not apply to violations of state law claims. These claims are governed by state immunity law. Kentucky immunity law is discussed in the Kentucky Supreme Court decision, *Yanero v. Davis*,

65 S.W.3d 510 (Ky.2001), which explains "official immunity" is "immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions." *Id.* at 521.

Quoting from 63C Am.Jur.2d, *Public Officers and Employees,* § 309 (1997), we explained in *Yanero, supra,* when public officers and employees are sued in their individual capacities, they "enjoy only qualified official immunity..." *Id.* at 522. The court further explained, quoting from the Restatement (Second) of Torts, § 895D, that qualified official immunity applies to the negligent performance by a public officer or employee of: (1) discretionary acts or functions, *i.e.,* those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority. *Id.*

Appellees in this case argue the written Board policy preempted any claim that appellants' actions were discretionary. Appellees also contend that in the context of school searches, the term "strip search" contemplates something far less than a nude search, and therefore, the written school policy regarding such searches would apply, and the teachers/administrators are not entitled to qualified immunity against the state claims.

■ We believe the actions of the teachers/administrators were made in good faith, were discretionary in nature and were within the scope of their authority because the Board policy did not clearly apply to the searches conducted on these female students. The term "strip search" was not defined any where within the school's policies. This would imply the term should be given its ordinary meaning, that which a reasonable person would interpret the term to mean. The majority of

cases using the term "strip search" have defined it as requiring the *removal* of clothing. (*See McGee v. State,* 105 S.W.3d 609 (Tex.Crim.App.2003); *Craddock v. Com.,* 40 Va.App. 539, 580 S.E.2d 454 (2003); *Roberts v. Rhode Island,* 175 F.Supp.2d 176 (D.R.I.2000); *State v. Esquivel,* 987 S.W.2d 481 (Mo.App. W.D. 1999))

If the facts are as the students allege in this case, the searches do not involve removal of the girl's clothing, but rather lifting their shirts above their bras and lowering their shorts to their knees. Their underwear was never touched or altered in any way, nor was their clothing fully removed from their bodies.

■ We have issued many decisions expressing the common rule that the "plain meaning" of statutes controls when interpreting statutory language. *See Wheeler & Clevenger Oil Co., Inc. v. Washburn,* 127 S.W.3d 609, 614 (Ky.2004). And the only time the "plain meaning" rule is not to be applied is when doing so "would constitute an absurd result." *Id.* at 614. We think the interpretation of policy language follows this same "plain meaning" rule and therefore, the "plain meaning" of "strip search" should be applied to the Board's policy as such would not produce an absurd result, but rather the most reasonable outcome.

There were four cases prior to 1998, when these girls were searched, dealing with "strip searches" of students. We think these cases define the term "strip search" as a nude search, or search far more invasive than those endured by the female students in this case.

The Kentucky Court of Appeals case involving "strip searching" a student is *Rone v. Daviess County Bd. of Educ.,* 655 S.W.2d 28 (Ky.App.1983), which describes the involved strip search as:

Although appellant was requested during the search to lower both his trousers and undershorts, those articles of his clothing were never removed. Additionally, the appellant was never offensively touched during any part of the search. The only clothing completely removed from the appellant was his jacket and shoes. The avowed purpose of having the appellant lower his shorts and undershorts to his thighs was to determine if either contained drugs or marijuana, underclothing being a prime hiding place for controlled substances.

*Id.* at 30.

We believe this description entails a search where clothing and underwear are at least partially removed.

The Supreme Court case, *Doe v. Renfrow*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981), involved a strip search of a 13 year old female student performed after a police dog "alerted" to the presence of drugs on her person. The dissent from this case reads:

Petitioner was met at the nurse's office by two adult women, one a uniformed police officer. After denying that she had ever used marihuana, petitioner was ordered to strip. She did so, removing her clothing in the presence of the two women. The women then looked over petitioner's body, inspected her clothing, and touched and examined the hair on her head.

*Id.* at 1023–1024, 3016, 101 S.Ct. 3015.

This case at least indicates the strip search involved full removal of the girl's clothing. The opinion later references the "nude search" of the girl's body, again indicating, a level of search exceeding that performed on the two girls in this case.

The 6th Circuit Court of Appeals case, *Williams v. Ellington*, 936 F.2d 881 (6th Cir.1991), is the closest case to describe strip searching in a way that would come close to encompassing the alleged searches in this case. In *Williams*, the opinion reads:

Ellington asked Easley to take Williams into her office and search her person, in the presence of a female secretary. Inside Easley's office, Williams was asked to empty her pockets which she promptly did. Easley then asked the girl to remove her T-shirt...[which she did]. Williams was then required to lower her blue jeans to her knees. In her deposition, Williams testified that Easley pulled on the elastic of her undergarments to see if anything would fall out, but Easley disputes this contention.

*Id.* at 883.

We believe this description still exceeds the severity of the searches conducted in this case, and does not clearly define the term "strip search" to mean a search much less intrusive than a nude search.

The remaining 6th Circuit Case, *Tarter v. Raybuck*, 742 F.2d 977 (6th Cir.1984), involves a student who had been detained and searched by school officials because of suspicion of marijuana possession and possible dealing. The court describes the involved search as, "Pursuant to defendant's request, David Tarter emptied his pockets, removed his jacket, boots and shirt.....Raybuck and Spargur then asked Tarter to remove his pants; Tarter refused, the search ceased, and the police were summoned." *Id.* at 979–80. The court later addresses the search saying, "[Tarter's] eventual refusal to be strip-searched ...", *id.* at 980, which would indicate the court did not feel the search that had occurred was a complete strip search.

Although this case does not involve student strip searches, we believe the 6th Circuit Court of Appeals said it best in *Spear v. Sowders*, 33 F.3d 576 (6th Cir.

1994): "A 'strip search,' though an umbrella term, generally refers to an inspection of a naked individual...." *Id.* at 581.

As the above mentioned cases were the only pre–1998 cases which the Board could refer for the definition of "strip search" within the context of a school setting, we hold the Board's policy did not apply to the searches alleged in this case as the term "strip search" used within the policy contemplated nothing less than a nude search of the type described in these cases or common language of the day. We also find the acts of the teachers/administrators were made in good faith, were discretionary in nature and within the scope of their authority, and thus, they are also entitled to qualified immunity against the state claims.

The decision of the Court of Appeals is hereby reversed and the judgment of the trial court is reinstated.

LAMBERT, C.J., COOPER, GRAVES, JOHNSTONE, and WINTERSHEIMER, JJ., concur.

KELLER, J., dissents by separate opinion.

Dissenting Opinion by Justice KELLER.

I respectfully dissent for two reasons.

First, this was a strip-search. The young girls were required to do far more than roll up their shirt sleeves or turn out their pockets. They were required to raise their shirts above their breasts and to drop their pants below their knees, thus moving their clothing so as to expose their underwear. Though they were not required to strip naked, they were still required to move their clothing from its normal position and to expose areas of their bodies usually considered private. That is a strip-search.

Second, in the Fayette County Public Schools, there is no uncertainty about whether a strip-search is permitted. To its credit, the Fayette County Board of Education has adopted a policy against strip-searches. The existence of that policy means that the persons conducting the search knew it was prohibited.

Accordingly, I would affirm the Court of Appeals and remand this case to the trial court for further consideration of the Appellants' claims.